**In the Matter of Melvin E. HUBKA, Debtor.**

**Bankruptcy No. BK85–2819.**

United States Bankruptcy Court, D. Nebraska.

Sept. 10, 1986.

---

Melvin E. Hubka, pro se.

Steve Russell, Asst. U.S. Atty., Omaha, Neb., for Commodity Credit Corp.

## MEMORANDUM OPINION RE OBJECTION TO CLAIMS OF THE UNITED STATES OF AMERICA ACTING THROUGH THE COMMODITY CREDIT CORPORATION

TIMOTHY J. MAHONEY, Bankruptcy Judge.

A status hearing on debtor's objection to claim filed by the United States of America on behalf of the Commodity Credit Corporation was held on August 27, 1986, in Lincoln, Nebraska. The debtor and debtor-in-possession, Melvin Hubka, appeared pro se and Steve Russell of the United States Attorney's Office appeared on behalf of the Commodity Credit Corporation.

A status hearing, under the local practice of the United States Bankruptcy Court for the District of Nebraska is a hearing at which no evidence is received but the Court listens to oral argument concerning legal issues. If the Court determines that the matter can be finally decided upon a question of law, a decision is rendered. If the Court decides, after listening to argument of counsel, that there is a factual dispute, the matter is set for further evidentiary hearing at a later date.

Based upon the objection and the Proof of Claim on file, the Court concludes part of the objection can be ruled upon as a matter of law and part must be set for hearing.

■ The debtor has filed an objection to the claim of the Commodity Credit Corporation and the objection is in four parts. First, the claim of the Commodity Credit Corporation includes the amount of $5,160.29 which is apparently the balance due on a loan made by the CCC to the debtor to enable the debtor to purchase two York storage bins in 1979. The amount of the debt was secured by a security interest in the two bins and the security interest was perfected by the filing of an original financing statement on October 10, 1979, and a corrected financing statement filed

on October 19, 1979. Attached to the Proof of Claim filed by the CCC is a continuation statement intended to continue the effect of the perfected security interest. That continuation statement was filed April 6, 1984.

The debtor alleges that the claim concerning the two York bins is not a secured claim because the perfection of the security interest terminated five years following the filing of the original and/or corrected financing statement. The debtor alleges that the filing of a continuation statement on April 6, 1984, more than six months prior to the termination of the original financing statement, was not effective to continue the perfection of the security interest. He relies upon the language of the Nebraska version of the Uniform Commercial Code, § 9–403(3) which states in part:

> "A continuation statement may be filed by a secured party within six months prior to the expiration of the five-year period specified in subsection (2).... Upon timely filing of the continuation statement, the effectiveness of the original statement is continued for five years after the last date to which the filing was effective whereupon it lapses in the same manner as provided in subsection (2) unless another continuation statement is filed to such lapse."

The debtor argues that since April 6, 1984, is more than six months prior to the expiration of the five-year life of the original financing statements, as a matter of law the perfection of the secured interest lapsed.

This Court believes the debtor is correct in his analysis of the law. The perfection of the security interest in the two York bins lapsed in 1984 and, therefore, that portion of the CCC claim including the amount of $5,160.29 is unsecured and the objection to that portion of the claim is sustained.

The issue of the timing of the filing of the continuation statement has been the subject of several cases and of attorney generals' opinions in at least four states. There does not appear to have been any cases decided in Nebraska. The earliest post-UCC response to the question is an Iowa attorney general's opinion relying on pre-Code law to hold that the six-month limit was mandatory, so that a continuation statement filed early was not effective. The alleged reason for the rule was that under the filing systems of the 1920's, at least, it was too burdensome to anyone searching the files to have to go back more than a specified number of months looking for a continuation statement. See *Op. Atty.Gen. Iowa*, 12 UCC Rep. 1251 (1973). This rationale has been generally followed, despite the fact that it makes little sense under modern filing systems. See *In re Hays*, 47 B.R. 546, 41 UCC Rep. 1484 (Bankr.N.D.Ohio, 1985); *In re Vermont Fiberglass*, 44 B.R. 505 (Bankr.D.Vt.1984); *Op.Atty.Gen. Montana*, 40 Op.Ag. No. 60, 39 UCC Rep. 709 (1985); *Op.Atty.Gen. North Carolina*, 22 UCC Rep. 266 (1977); *Op.Atty.Gen. Ohio*, No. 74–025, 14 UCC Rep. 360 (1974).

The only case holding an early termination statement effective is *In re Callahan Motors, Inc.*, 538 F.2d 76, 19 UCC 963 (3d Cir.1976), *cert. den.* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 and that case was decided on unusual facts. The Court found that the New Jersey Secretary of State had induced premature filings by a letter which could reasonably have been understood to request filing of continuation statements as soon as possible after July 1, 1967, regardless of when the original financing statement was filed. The Court specifically declined to determine whether absent that official error, an early continuation statement could be given legal effect.

Some commentators take the contrary position, they suggest that a filing officer might use § 9–403(3) as authority for refusing to accept an early continuation statement. However, if the officer accepts the statement for filing, then it should be given effect. Under modern filing systems, there is no burden on a searcher from an early filing. For example, Grant Gilmore, who participated in drafting parts of Article 9 of the UCC., states:

"It is unfortunate that § 9–403(3) adds to the provision for refiling within the six-month period prior to lapse the suggestion that only 'timely filing' of the continuation statement is effective to preserve the original filing. The 'timely filing' language sounds like a statutory reenactment of the old 'premature renewal cases'. It is to be hoped that the courts will refuse to pick up this inference from what was undoubtedly no more than a drafting inadvertence. Surely, if a secured party files a continuation statement before the ·permissible time, if the statement is received and placed on file, if the means of acquiring notice are available to all creditors, there is no conceivable reason why so harmless an error should lead to the invalidation of· the security interest. The provision for limiting refiling to the last six months of the original filing period should be taken merely as a device to avoid cluttering the files with useless papers; its only effect should be as an authorization to the filing officer to refuse to accept continuation statements which are prematurely presented to him."

1. G. Gilmore, *Security Interests in Personal Property*, 587. *See also*, B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* 2–72 (1980).

It is obvious to this Court that the commentators don't think the law should mean what it says. However, the matter has been discussed enough times by the attorney general of various states and by enough courts, that if the legislatures of the various states and the drafting committee of the Uniform Commercial Code wanted to change the plain language of the statute, there has been plenty of time to do it. Since it has not been changed, this Court interprets the language to be mandatory and finds that a filing of a continuation statement outside the last six months of life of a financing statement causes the perfection of a security interest to lapse.

The next objection by the debtor is that the portion of the claim filed by the CCC concerning grain sorghum as collateral for a debt in the amount of $6,982.52 is an unperfected security interest because the financing statement allegedly fails to contain the address of the creditor as required by § 9–402 of the Uniform Commercial Code and identifies the collateral only as "grain sorghum" with no further identifying attributes such as the number of bushels or the location. The Court has reviewed the Proof of Claim as well as the promissory note and security agreement and the financing statement filed December 24, 1984. The financing statement shows on its face the address of the Commodity Credit Corporation including the post office address. That portion of the objection is overruled. The financing statement also includes the following language:

"FINANCING STATEMENT—COVERS FOLLOWING PROPERTY, INCLUDING ACCESSIONS, ACCESSORIES, PARTS AND EQUIPMENT AFFIXED, PRODUCTS AND PROCEEDS (which terms shall not be construed as consent by Secured Party for sale thereof).

"GRAIN SORGHUM. The security agreement at Paragraph 2 states:

"2. *Collateral Security.* The producer hereby sells, assigns, mortgages, and hypothecates to CCC as collateral security for the payment of the note plus charges and interest all of the commodity described in the above Schedule of Commodity, together with all authorized replacements, substitutions, additions and accessions thereto which is stored in the bin or crib specified in such Schedule (even though a larger quantity than shown in Column B) and which is located on the premises described above."

Above that language are a number of blocks with letters and numbers apparently identifying the bin and the approximate quantity of grain sorghum in which the CCC claims a security interest. The document specifies that approximately 1,523 bushels of grain sorghum is the collateral and the loan amount is $6,366.14. The date of the note and the security agreement is

December 20, 1984, and the note and security agreement which are contained on one document, are signed by both Melvin Hubka and Betty Hubka, whom the Court assumes is the spouse of Melvin Hubka. The financing statement is also signed by both Melvin and Betty Hubka.

The debtor argues that a simple description in the financing statement "grain sorghum" is too vague to be held to describe the item of collateral. He further argued that if such description were to be valid, then any, and all, grain sorghum held by the producer would have to be considered under a lien, and not only the amount for which the loan was arranged.

 This Court is not convinced. The purpose of the description in a financing statement is to permit a third party searching the appropriate records to be alerted to the fact that some creditor is claiming some interest in the type of collateral described. The financing statement provides a general description of the collateral and the address at which the third party can obtain further information about the amount of the collateral or other specifics concerning the collateral. The extent of the creditor's lien in the grain sorghum is determined by the language of the security agreement, not by the general description of collateral in the financing statement.

The objection of the debtor to this portion of the claim of the CCC is overruled.

 The third objection is to that portion of the claim alleging a debt of $62,895.82 plus a debt of $154.82 secured by corn. The combined promissory note and security agreement were signed by Melvin Hubka only on December 30, 1981, and the financing statement, signed by Melvin and Betty Hubka was filed January 4, 1982. The debtor alleges that the financing statement does not provide an accurate address for the debtor, describes the collateral only as "corn" and, therefore, is too vague and further, that the note and security agreements are not signed by the debtor's wife. Apparently the debtor is claiming that the wife does or may have some interest in the

corn in which he granted a security interest in the CCC. All of these issues are factual and will require an evidentiary hearing. The Court cannot determine from a review of the financing statement what the correct address of the debtor was at the time the financing statement was filed. A review of the promissory note and security agreement make it clear that only a specified number of bushels of corn were offered to the CCC as collateral for the debt. There, therefore, remains a question in the mind of the Court whether or not more description was necessary to perfect an interest in specified bushels of corn in specified locations and whether or not the term "corn" is sufficient. Finally, since it appears from the Proof of Claim and the attached documents that the course of dealing between the CCC and the debtor was that the debtor's spouse signed promissory notes and security agreements as well as financing statements on earlier occasions, the allegation by the debtor that the CCC may not have a perfected security interest in a portion of the grain claimed by Betty Hubka requires a factual determination. This portion of the objection will be set for a one-half day of evidentiary hearing.

Finally, the debtor claims that there has never been an itemized accounting for payments received by the creditor from the debtor and the debtor requests such an accounting before any claim is allowed. Such an accounting will be a required portion of the evidence that the CCC shall provide at the evidentiary hearing.

The facts as elicited from the Proof of Claim and the law as referred to in this memorandum opinion are this Court's findings of fact and conclusions of law required by the Bankruptcy Rules.